UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

HEATHER ATWOOD,                    :
     Plaintiff,                    :
                                   :
v.                                 :          Civil No. 3:04cv207 (JBA)
                                   :
TOWN OF ELLINGTON, et al.,         :
     Defendants.                   :

<u>RULING ON TOWN OF ELLINGTON'S
MOTION FOR SUMMARY JUDGMENT [Doc. # 53]</u>

Plaintiff Heather Atwood ("Atwood") has filed an eight-count Second Amended Complaint [Doc. # 41] against Michael Nieliwocki ("Nieliwocki"), a former Ellington constable, and the Town of Ellington ("Town"),[1] arising from an alleged sexual assault committed by Nieliwocki against Atwood in the early morning hours of February 9, 2002.  Counts One through Five allege, respectively, that Nieliwocki violated Atwood's right to substantive due process, used unreasonable force in violation of the Fourth Amendment, committed common law assault and battery, and committed negligent and intentional infliction of emotional distress.  Counts Six and Seven allege that the Town must pay damages for which Nieliwocki is found liable under Connecticut General Statutes §§ 7-465 and 7-101a.  Count Eight alleges a <u>Monell</u> claim that the Town failed to adequately screen, train and

---

[1] Plaintiff also filed a separate complaint against State Police Sgt. William Konieczny, <u>see</u> <u>Atwood v. Konieczny</u>, 3:05cv248(JBA) [Doc. # 1], which has been consolidated with the present case [Doc. # 67], but which is not the subject of this motion for summary judgment.

supervise Nieliwocki in the course of his duties.[2]

The Town moves for summary judgment on Counts Six through Eight on the basis that Nieliwocki's alleged assault was outside the scope of his employment and therefore the Town cannot be held statutorily liable for damages incurred, and that plaintiff has not proffered any factual evidence to support her claim of negligent hiring, training and supervision. For the reasons that follow, the Town's motion will be granted.

## I.    FACTUAL BACKGROUND

For purposes of this motion, the facts of the case are essentially undisputed. The only real factual dispute is whether plaintiff was sexually assaulted by Nieliwocki or whether she consented to sexual contact with him. This factual dispute, however, is not implicated in the Town's Motion for Summary Judgment. The summary judgment record reveals the following.

### A.    Events of February 8-9, 2002

On the night of February 8, 2002, plaintiff and her sister, Megan Atwood, and Megan's boyfriend Justin Saucier, were celebrating Megan's 21st birthday. They started at Megan and Justin's apartment, where plaintiff drank a few beers. Atwood

---

[2]Although Count Eight of the complaint is not specifically designated as a § 1983 Monell claim, the parties have briefed it as such, and therefore the Court assumes plaintiff is not asserting a state law negligent hiring claim.

Dep., Def. Ex. E, at 56.[3]  Then they went to Cioppino's Bar &
Grill, located in Ellington, Connecticut, where plaintiff had "a
couple of shots and a couple of drinks."  Id. at 57.  At some
point during the night, plaintiff was so intoxicated that she
fell in the bar and decided to have Justin drive her home.  Id.
at 63, 70; Atwood Internal Affairs Investigation Stmt., Pl. Ex.
1, at 3.  As she left, she accidentally took another woman's
jacket and an altercation ensued, in which Megan became involved.
Atwood Stmt. at 3; Atwood Dep. at 60.  Megan then became angry
with plaintiff for leaving the bar with Justin.  Id.  During a
fight between plaintiff and her sister, shortly after 1:00 a.m.,
Ellington Constables Michael Nieliwocki and Joseph Grayeb, State
Trooper Robert Palmer, and State Trooper trainee Louis Kmon
arrived.  See Internal Affairs Report at 8-11.

    Plaintiff was so "severely intoxicated" and "she was swaying
so bad[ly] that she had to lean up against the [police] vehicle
to keep from falling."  Grayeb Stmt. to Vernon Police, Internal
Affairs Report, Ex. 11, at 2.  Plaintiff was "standing in very
close proximity to Nieliwocki and was touching him and at one
point attempted to hug him."  Internal Affairs Report at 8.

---

[3]Neither party has included page citations in its briefs or Local Rule
56(a) statements.  This practice violates D. Conn. L. Civ. R. 56(a)(3), which
requires each statement of material fact to be "followed by a specific
citation" to an affidavit, deposition testimony, or other admissible evidence
(emphasis supplied).  A general citation to a deposition, without a page
number, is neither an efficient nor effective way to direct the Court's
attention to what a party believes is important, hence the Local Rule
requirement.

Nieliwocki determined that the argument between the sisters was only verbal and "it didn't look like there was anything criminal," but that they could not go home together because they were arguing and they could not drive because they were intoxicated.  Nieliwocki Stmt., Def. Ex. F, at 2.  Grayeb took Megan home and Nieliwocki took Heather to a Holiday Inn in the town of Vernon.  Id.  Nieliwocki checked plaintiff into the hotel by asking her for her credit card and driver's license, and then having her sign the credit card slip.  Id. at 12.  The night clerk at the motel described plaintiff to the Vernon Police Department as "being loud with slurred speech."  Internal Affairs Report at 12.  Atwood does not remember anything after that, except waking up the next morning wearing only her socks.  Atwood Dep. at 82; Atwood Stmt. to Vernon Police at 2.

Nieliwocki then returned to his office, where he and Grayeb completed some paperwork, and Nieliwocki told Grayeb that plaintiff had tried to make a "pass" at him in the motel room.  Nieliwocki Stmt. at 4; Grayeb Stmt. at 3.  At approximately 3:00 a.m., after completing his shift, Nieliwocki went back to the motel, ostensibly to return plaintiff's keys, which she had left in the police cruiser; but when Grayeb asked him, he told Grayeb that he was not going back to the motel, because "basically it was my own personal business."  Id.

Grayeb "got this gut feeling that Mike [Nieliwocki] was

4

going back to the hotel for something" and went to check on him.
Grayeb Stmt. at 3.  He found Nieliwocki in the hotel parking lot,
where Nieliwocki said he was returning plaintiff's keys.  Id. at
3-4.  Nieliwocki then went inside and Grayeb drove away, but
Grayeb "didn't feel right so [he] turned around and went back to
the hotel."  Id. at 4.  When he arrived he saw Nieliwocki
speaking on the phone at the front desk.  Nieliwocki gave
plaintiff's keys to the manager and then Grayeb and Nieliwocki
went outside, where Grayeb told Nieliwocki, "let's get out of
here," and warned him "not to go up to the room alone because she
was really 'bombed.'  Mike [Nieliwocki] said that it was OK, that
her keys were at the front desk.  He further said, 'Besides, I'm
off duty.'"  Id.

Atwood remembers nothing about those few hours in the hotel,
only that when she awoke she "knew something was not right,
because she felt soreness in her vaginal area and had a lot of
bruises on her legs and inner thighs."  Atwood Stmt. to Vernon
Police at 2.

On February 9, 2002, plaintiff went to a hospital for an
examination, and later made a report to the Vernon Police
Department, which was investigated but concluded with no criminal
charges brought against Nieliwocki.  See Letter from Asst.
State's Attorney Sedensky to Sgt. William Konieczny, 11/7/02, Pl.
Ex. 13.  The State Police initiated an internal affairs

investigation, which concluded that Nieliwocki was guilty of "conduct unbecoming an officer."  Internal Affairs Report at 22. As a result, Nieliwocki was discharged by the Ellington Board of Selectmen on October 15, 2003.  Letter from Stupinski to Nieliwocki, 10/16/03, Ex. 14 to Stupinski Dep., Pl. Ex. 9.

### B.   Training and Supervision of Ellington Constables

The elected Ellington First Selectman in February 2002 was Michael Stupinski, who in that capacity was also the Town's Chief of Police.  Stupinski Dep., Pl. Ex. 9, at 8.  At that time Ellington had a "Resident Trooper Agreement" with the State Police for Ellington's public safety services.  The resident trooper oversaw the town constables, who were only part-time. Id. at 15, 24-25.  The Resident Trooper Agreement provided:

> The Town shall delegate to the Division of State Police the authority to supervise and direct the law enforcement operations of appointed constables and police in the Town.   All town police officers/constables shall be subject to the applicable provisions of the current Administration and Operations Manual of the Department of Public Safety.

Pl. Ex. 12 at § I.  The Agreement further provided that the "Town shall retain administrative responsibility for its personnel, including but not limited to, ensuring compliance with POST [Police Officer Service and Training] requirements regarding hiring, lateral entry appointments, and in-service training responsibilities." Id. at § II.  Stupinski interpreted this section to mean that the Town had responsibility for ensuring

that the constables met State Police training and administrative requirements, but that the Town itself was not required to provide such training, and in fact, the Town delegated all required training of its constables to the State Police. Stupinski Dep. at 30.

While it was foreseeable to Stupinski that Ellington constables would likely come in contact with intoxicated female citizens during the course of their employment, the Town did not "have any policy at all regarding any procedures that should be used when... male constables came into contact with intoxicated females." Id. at 27.  State Police policies governed such issues, and Stupinski would have "deferred to their expertise." Id. at 28.

The Resident Trooper Agreement requires that "Town police officers shall conform to applicable A&O Manual and other department directives" and that "[o]rders and directives issued by the town shall not conflict with the department A&O Manual, general orders, or special orders."  Pl. Ex. 12 at § 15.3.2(e)((e)).  The record contains no evidence of any policies and procedures in the State Police A&O Manual applicable to officer interactions with intoxicated female citizens, nor the contents of the required training provided by the State Police to Ellington constables, including Nieliwocki, nor whether that training addressed procedures for dealing with intoxicated

females with whom officers came in contact in the course of their duties.

Plaintiff claims that the Town has <u>Monell</u> liability to her for Nieliwocki's assault because it renewed Nieliwocki's constable appointment in November 2001, notwithstanding Nielikowki's misconduct toward two female members of the Ellington Volunteer Ambulance squad several months earlier.  In August 2001, these two women reported to Resident Trooper Harmon that Nieliwocki had twice handcuffed one of them against her will, leaving bruises, and threatened the other woman twice with his pepper spray.  Interdepartmental Message Report, 8/17/01, Ex. 10 to Stupinski Dep., Pl. Ex. 9.  The woman who had been handcuffed was "fearful of" Nieliwocki.  <u>Id.</u>  A no-contact instruction was given ti Nieliwocki, which he violated by returning to the ambulance office the next day, and he was re-instructed not to have any contact with these women except for business reasons.  <u>Id.</u>  The women declined to make a formal complaint.  <u>Id.</u>  This pattern of behavior was never brought to Stupinski's attention at the time, although Harmon placed a report in Nieliwocki's personnel file.  Stupinski, however, did not review Nieliwocki's file before reappointing him to another two-year term in November 2001.  Stupinski Dep. at 14, 20.

## II.  STANDARD

Summary judgment is appropriate under Federal Rule of Civil

8

Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Materiality is determined by the substantive law that governs the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim.  Celotex, 477 U.S. at 322-23.  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc.,

260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor.  Anderson, 477 U.S. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").  In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion.  Matsushita, 475 U.S. at 587.  However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient.  Id. at 586 (citations omitted).

## III. DISCUSSION

### A.   Conn. Gen. Stat. § 7-465

Under Connecticut law, a municipality must reimburse an employee for "financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence, or for alleged infringement of any person's civil rights, on the part of such

10

officer or such employee while acting in the discharge of his duties." Conn. Gen. Stat. § 7-101a.  This statute governs allocation of legal expenses between a municipality and its employees who are subject to civil suits, but "does not provide a direct cause of action against a municipality." <u>Karbowicz v. Borough of Naugatuck</u>, 921 F. Supp. 77, 78 (D. Conn. 1995); <u>see also</u> <u>Carretta v. Town of Greenwich</u>, No. CV92-0125560S, 1993 WL 128208 at *2 (Conn. Super. Ct. April 14, 1993) (plaintiff alleging malicious prosecution by town officials did not state cause of action under § 7-465).  Therefore Count Seven of the Second Amended Complaint brought under this statutory provision must be dismissed.

### B.   Conn. Gen. Stat. § 7-465

Count Six against the Town is brought under Connecticut's indemnity statute, which reads, in relevant part:

> Any town, city or borough,... shall pay on behalf of any employee of such municipality,... all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damages to person or property, except as set forth in this section, if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was <u>acting in the performance of his duties and within the scope of his employment</u>, and if such occurrence, accident, physical injury or damage was <u>not the result of any wilful or wanton act</u> of such employee in the discharge of such duty....  Any employee of such municipality, although excused from official duty at the time, for the purposes of this section shall be deemed to be acting in the discharge of duty when engaged in <u>the immediate and actual performance of a public duty imposed by law</u>....

11

Conn. Gen. Stat. § 7-465 (emphases supplied).  This section, which is designed to abrogate municipal immunity for certain purposes, "allows an action for indemnification against a municipality in conjunction with a common-law action against a municipal employee."  Gaudino v. Town of E. Hartford, 87 Conn. App. 353, 355, 865 A. 2d 470, 471-72 (Conn. App. 2005).

The Town argues that it is not liable under this statute because Nieliwocki was not acting within the scope of his employment when he assaulted Atwood, and, even if he were, his assault on plaintiff was a "wilful or wanton" act, which is outside the scope of the statute.  Plaintiff argues that Nieliwocki went to the motel where he had brought Atwood, purportedly to return the car keys she had left in his police cruiser while being taken into protective custody, showing that Nieliwocki still was acting in the course of his official duties.  Plaintiff further argues that it is a disputed question of fact whether Nieliwocki's acts were a result only of his wilful and wanton behavior or also a result of Constable Grayeb's failure to secure plaintiff's keys properly or prevent Nieliwocki from assaulting plaintiff.

Section 7-465 essentially codifies the doctrine of respondeat superior with respect to municipal employers and employees.  The underlying rationale of respondeat superior is that a principal,

12

who prefers to manage his affairs through others, remains bound to so manage them that third persons are not injured by any breach of legal duty on the part of such others _while they are engaged upon [the principal's] business_ and within the scope of their authority. But _it must be the affairs of the principal, and not solely the affairs of the agent, which are being furthered_ for the doctrine to apply.

Gutierrez v. Thorne, 13 Conn. App. 493, 498, 537 A.2d 527, 530 (Conn. App. Ct. 1988) (internal citations and quotation marks omitted, emphases in original).  Thus, "the vital inquiry in this type of case is whether the servant on the occasion in question was engaged in a disobedient or unfaithful conducting of the master's business, or was engaged in an abandonment of the master's business....  Unless [the employee] was actuated at least in part by a purpose to serve a principal, the principal is not liable." Mullen v. Horton, 46 Conn. App. 759, 764, 700 A.2d 1377, 1380 (Conn. App. 1997) (quoting Glucksman v. Walters, 38 Conn. App. 140, 144, 659 A.2d 1217, cert. denied, 235 Conn. 914, 665 A.2d 608 (1995)).

"Ordinarily it is a question of fact as to whether a wilful tort of the servant has occurred within the scope of the servant's employment and was done to further the master's business....  But there are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law." Id. (quoting A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 207, 579 A.2d 69 (1990)).

"Absent special circumstances tending to show otherwise...,

13

sexual harassment and sexual assault are outside the scope of an employee's employment and not in furtherance of the employer's business." <u>Radesky v. First Am. Title Ins. Co.</u>, No. 302cv1304 (JBA), 2003 WL 22119183 at *5 (D. Conn. Aug. 29, 2003).  In <u>Gutierrez</u>, for example, an aide was alleged to have raped a client of the Department of Mental Retardation, for whom he was responsible to assist in managing her activities of daily living in her apartment.  The aide had access to the victim's apartment because the Department had given him keys in case of an emergency, and it was part of his job to visit the plaintiff in her apartment on a regular basis.  <u>Gutierrez</u>, 13 Conn. App. at 497.  The Appellate Court held that it was

> ...clear that [the caseworker] was not furthering the [Department of Mental Retardation's] business interests when he sexually assaulted the plaintiff.  He was engaging in criminal conduct which had no connection to the defendant's business of providing supervision and training to mentally retarded persons regarding daily living skills.  Since there were no facts before the court from which it could conclude that [the aide] was furthering the defendant's interests, the defendant's nonliability under a respondeat superior theory was properly determined as a matter of law.

<u>Id.</u> at 499.

In this case, it is abundantly clear that Nieliwocki could be furthering no business interests of the Town of Ellington when he allegedly sexually assaulted Atwood.  While his actions in transporting plaintiff to a motel and returning her keys could be within the scope of his employment, which required that he not

permit the plaintiff to drive while intoxicated or harm her sister during a fight, Nieliwocki was not, as a matter of law, serving any interests of his employer at the time he engaged in sexual conduct with Atwood.   See Girden v. Sandals Int'l, Ltd., 206 F. Supp. 2d 605, 607 (S.D.N.Y. 2002) (applying Connecticut law and holding that resort employee acted outside the scope of his employment when he sexually assaulted plaintiff while giving her a sailing lesson).   "[W]hen [defendant's] activity with the alleged victim became sexual, the employee abandoned and ceased to further the employer's business." Reynolds v. Zizka, No. CV 95055222S, 1998 WL 123047 at *3 (Conn. Super. Ct. Mar. 5, 1998) (holding priest acted outside scope of employment when he sexually molested 16-year-old parishioner) (citing Gutierrez, 13 Conn. App. at 493).[4]   Because Nieliwocki's sexual conduct -- consensual or not -- was not "in the performance of his duties and within the scope of his employment" as required by Conn. Gen. Stat. § 7-465(a), plaintiff's claim under this statute must be dismissed.

---

[4] Cf. Mullen v. Horton, 46 Conn. App. 759, 700 A.2d 1377 (Conn. App. Ct. 1997).  In Mullen, the defendant, a priest and practicing psychologist, engaged in a two-year sexual relationship with an adult woman who was his parishioner and patient.  The Appellate Court held that the church's vicarious liability for the priest's conduct was a question of fact for the jury because the defendant arguably was acting in furtherance of his pastoral/counseling duties, even if in "an unauthorized, unethical, tortious" fashion, and because the church collected the profits from the defendant's private psychology practice.  Id. at 765-66.  Here, Nieliwocki and Atwood had no prior relationship and there is no argument that Nieliwocki's sexual acts were an attempt to help her.  There is also obviously no possible argument that the Town profited from Nieliwocki's sexual activity.

C.   **Monell** Claim

In Count Eight of the Second Amended Complaint, plaintiff alleges that the Town of Ellington is liable for failing to properly train and supervise Constable Nieliwocki and failing to engage in proper screening before reappointing him.

### 1.   Failure to Train

With regard to training, plaintiff argues that "the Town of Ellington made a deliberate choice to abdicate its responsibility for the training of its town constables to the Connecticut S[t]ate Police" even though it retained "administrative responsibility" for its personnel under the resident trooper contract.  Pl. Mem. in Opp. [Doc. # 58] at 15.  Plaintiff points to Stupinski's admission that it was foreseeable that his town constables might come in contact with intoxicated females but that the Town "failed to promulgate any policy regarding any contact between such officers and females similarly situated to the plaintiff.  Nor did he review any policies of the Connecticut State police regarding the same."  Id. at 16.

The Supreme Court has held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton v. Harris, 489 U.S. 378, 388 (1989).  "Moreover, for liability to attach in this circumstance the identified

16

deficiency in a city's training program must be closely related
to the ultimate injury."  Id. at 391.

The Second Circuit has established a three-prong test for
determining whether a municipality is liable for failing to train
or supervise its officers.  The plaintiff must show that: (1) "a
policymaker knows 'to a moral certainty' that her employees will
confront a given situation;" (2) "the situation either presents
the employee with a difficult choice of the sort that training or
supervision will make less difficult or that there is a history
of employees mishandling the situation;" and (3) "the wrong
choice by a city employee will frequently cause the deprivation
of a citizen's constitutional rights."  Walker v. City of N.Y.,
974 F.2d 293, 297-98 (2d Cir. 1992) (internal citations omitted).
Additionally, after discovery has been conducted, a plaintiff has
the burden to "identify a specific deficiency in the city's
training program and establish that that deficiency is 'closely
related to the ultimate injury,' such that it 'actually caused'
the constitutional deprivation."  Amnesty Am. v. Town of W.
Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (quoting City of
Canton, 489 U.S. at 391)).

There seems to be no dispute concerning the first prong of
the test.  Stupinski, who was in office in 2002, acknowledged
that town constables "would be coming into contact with
intoxicated individuals from time to time," and that some of

17

those individuals would be female.  Stupinski Dep. at 27.  There
is also no dispute that Nieliwocki's duties included traffic
stops of citizens driving under the influence of alcohol and
routine patrol for disturbances at Cioppino's Bar & Pub.  See
Internal Affairs Report, Def. Ex. C, at 11, 16.  Thus Nieliwocki
would be likely to come into contact with intoxicated females.

Under the second prong, the question is whether the
situation between Nieliwocki and Atwood was "a difficult choice
of the sort that training or supervision will make less
difficult."  See Walker, 974 F.2d at 297.  Here, Nieliwocki's
situation was not "a difficult choice" or a stressful situation
where rapid decisionmaking was required, or where there was
immediate potential danger to the officer or to others.  Nor was
it a situation, as in Canton, where specialized medical or other
technical training was called for.  Rather, Nieliwocki was
presented with an opportunity for sexual relations with a young
woman whom he had taken to a hotel during the course of his
official duties that night, which he calculatingly availed
himself of immediately after going off duty at the end of his
shift.  All witnesses (except Nieliwocki) believed that Atwood
was extremely drunk.  Constable Grayeb clearly thought
Nieliwocki's behavior inappropriate, to the point that he tracked
Nieliwocki down at the hotel and told him that he should not go
to Atwood's room alone.  The Internal Affairs investigation found

that Nieliwocki's behavior after leaving duty was "conduct unbecoming an officer," even while it questioned Atwood's character and veracity and made no finding of non-consensual sex. Thus, this case presents a situation where Nieliwocki was called on to make an adult common sense judgment as to whether his desired activity constituted appropriate conduct with a woman who was clearly intoxicated (much less by an officer), a judgment about which everyone else who was involved or who investigated afterwards was in agreement. There was only one correct answer to the question whether Nieliwocki should have gone into Atwood's hotel room and had sex with her that night. Where "the proper response... is obvious to all without training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise." Walker, 974 F.2d at 299-300.

"That general rule, however, does not apply in every case. While it is reasonable for city policymakers to assume their employees possess common sense, where there is a history of conduct rendering this assumption untenable, city policymakers may display deliberate indifference by doing so." Id. at 300. In the present record, there is no evidence that any sexual conduct by any constable or law enforcement officer had been called into question in the Town before February 2002. Plaintiff

19

argues that the 2001 misconduct by Nieliwocki against two female members of the Ellington volunteer ambulance squad is analogous, but training addressing workplace violence would not have been likely to prevent the assault on a citizen as alleged in this case.  Moreover, Nieliwocki's August 2001 behavior is not such that would have placed the Town on notice of a need to train officers concerning sexual activities with intoxicated citizens taken into protective custody.  Cf. Valanuela v. Snider, 889 F. Supp. 1409, 1414 (D. Colo. 1995) (police department "had a history of numerous complaints alleging [defendant's] activities with regard to improper sexual contacts with females [he arrested], using his authority as a police officer.").  While Nieliwocki's behavior toward the ambulance squad members may well have put his superiors on notice to question his professional judgment or qualifications, the two incidents are not sufficiently similar that training to prevent one would likely have prevented the other.

Plaintiff does not proffer evidence regarding any specific training that the Town should have undertaken to prevent Nieliwocki's behavior.  Plaintiff has shown that the Town contractually delegated its constable training to the Connecticut State Police, but argues that such delegation amounts to an "abdication" of the Town's responsibilities.  The resident trooper agreement does not require that the Town actually conduct

the training itself,  <u>see</u> Contract Between State of Conn. Dep't
of Public Safety, Division of State Police, and Town of
Ellington, Pl. Ex. 12, at § II, and plaintiff has not proffered
any evidence of whether or what training Nieliwocki and other
Ellington constables received from the State Police regarding
contact with intoxicated female citizens.  The record contains no
evidence concerning whether the A&O Manual includes policies for
dealing with intoxicated female citizens, or sexual contact with
citizens taken into protective custody.  The mere fact that the
Town itself did not provide training or enact policies concerning
these matters is insufficient to show that the Town's deferral to
the State Police for supervision and training of its constables
resulted in deficient training that could have contributed to
Nieliwocki's sexual misconduct.

Plaintiff argues that even if there was no written policy
about bringing intoxicated female citizens to hotels, the fact
that the four officers present at Cioppino's during the incident
in the parking lot all acquiesced to Nieliwocki taking Atwood to
a hotel indicates that the Town had a policy and practice of
allowing male constables to transport females alone to hotels,
which plaintiff suggests is <u>prima facie</u> unconstitutional.  First,
plaintiff offers no evidence that Nieliwocki or any other
constable had ever previously taken an intoxicated female to a
hotel, and this single incident is insufficient to prove the

21

existence of a policy or pattern and practice on the part of the Town.  Second, while it would seem prudent for male officers to avoid such circumstances, even if only to avoid the appearance of impropriety, and Nieliwocki could have requested transport assistance from Troop C, see Stupinski Dep. at 51, plaintiff has introduced no evidence showing that allowing a male officer to transport a lone, intoxicated female citizen to a hotel will foreseeably lead to a violation of her constitutional rights. The rule urged by plaintiff, that male officers never may transport lone, drunk female arrestees or citizens, both contravenes the purpose of Connecticut's protective custody statute[5] and insults the integrity of the vast majority of officers who exercise sound, professional judgment and restraint both on- and off-duty.

Without evidence concerning any unconstitutional policy on the part of the Town, or any failure to adequately train on the part of the State Police, plaintiff has failed to meet her burden of showing that there was a "specific deficiency in the city's training program" that "actually caused" any deprivation of her constitutional rights.  Amnesty Am., 361 F.3d at 129.

### 2.  Failure to Screen

Plaintiff also argues that the Town failed to properly

---

[5]"Any police officer finding a person who appears to be intoxicated in a public place and in need of help may, with such person's consent, assist such person to his home, a treatment facility, or a hospital or other facility able to accept such person."  Conn. Gen. Stat. § 17a-683(a).

screen Nieliwocki when Stupinski reappointed him in November
2001, given the August 2001 pattern of harassment and aggression
toward the female members of the emergency ambulance crew, and
the February 2002 incident with plaintiff.[6]

"[A] plaintiff seeking to establish municipal liability on
the theory that a facially lawful municipal action has led an
employee to violate a plaintiff's rights must demonstrate that
the municipal action was taken with 'deliberate indifference' as
to its known or obvious consequences."  Bd. of Cty. Comm'rs of
Bryan Cty., Okla. v. Brown, 520 U.S. 397, 407 (1997).  Thus,
"[o]nly where adequate scrutiny of an applicant's background
would lead a reasonable policymaker to conclude that the plainly
obvious consequence of the decision to hire the applicant would
be the deprivation of a third party's federally protected right
can the official's failure to adequately scrutinize the
applicant's background constitute 'deliberate indifference.'"
Id. at 412.  Liability only may be imposed "on a finding that
this officer was highly likely to inflict the particular injury
suffered by the plaintiff."  Id. (emphases in original).  "The
fact that inadequate scrutiny of an applicant's background would
make a violation of rights more likely cannot alone give rise to
an inference that a policymaker's failure to scrutinize the

---

[6]The February 2002 incident itself obviously cannot constitute proof
that the Town had prior notice, before renewing Nieliwocki's contract, that he
was likely to assault plaintiff.

record of a particular applicant produced a specific constitutional violation." Id. at 410-11 (emphasis in original).

In Brown, the plaintiff alleged that a sheriff's reserve deputy used excessive force in dragging her out of her car after it was stopped. She alleged that had the county sheriff, the acknowledged designated municipal policymaker, adequately scrutinized the deputy's background, including prior convictions for assault and battery, resisting arrest, and driving while intoxicated, the sheriff would not have hired the deputy, and therefore she would not have been subjected to his unreasonable force. The Supreme Court rejected this claim, holding:

> The fact that [the deputy] had pleaded guilty to traffic offenses and other misdemeanors may well have made him an extremely poor candidate for reserve deputy. Had [the] Sheriff... fully reviewed [the deputy's] record, he might have come to precisely that conclusion. But unless he would necessarily have reached that decision because [the deputy's] use of excessive force would have been a plainly obvious consequence of the hiring decision, [the] Sheriff['s] inadequate scrutiny of [the deputy's] record cannot constitute 'deliberate indifference' to respondent's federally protected right to be free from a use of excessive force.

Id. at 414 (emphasis in original). The plaintiff had not "identif[ied] any pattern of injuries linked to" the sheriff's hiring practices, and a "showing of a[] [single] instance of inadequate screening is not enough to establish 'deliberate indifference.'" Id. at 412.

A municipality may be liable for a supervisor's failure to

24

screen or supervise subordinates "where municipal decisionmakers continue to adhere 'to an approach that they know or should know has failed to prevent' constitutional violations" in the past. Davis v. City of N.Y., 75 Fed. Appx. 827, 829 (2d Cir. 2003) (unpublished) (quoting Brown, 520 U.S. at 407). However, the plaintiff must show that "the official's inaction constitutes a 'deliberate choice,' that acquiescence may be properly thought of as a city 'policy or custom' that is actionable under § 1983." Amnesty Am., 361 F.3d at 126 (quoting City of Canton, 489 U.S. at 388). In other words, "[t]he operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a conscious choice rather than mere negligence." Id. at 128 (emphasis supplied, internal quotation and citation omitted).

The evidence in this case cannot reasonably support a finding that the Town was deliberately indifferent to the likelihood that Nieliwocki would violate plaintiff's constitutional rights by sexually assaulting her. A report of the August 2001 complaints from the two female ambulance staff members was placed in Nieliwocki's personnel file by the investigating state trooper. While it is perplexing why Stupinski failed to review the file before reappointing Nieliwocki in November 2001, particularly as he acknowledged "he would have taken [the report] into consideration" in his reappointment decision, Stupinski Dep. at 22, mere negligence

does not amount to deliberate indifference to plaintiff Atwood's constitutional right against unreasonable force or substantive due process violations.  It is clear that Stupinski did not know about Nieliwocki's troubling behavior toward females in the preceeding months when he decided to reappoint Nieliwocki. Additionally, the misconduct reported in August 2001 -- which may have been suggestive of aggressive or violent tendencies toward women -- was factually distinct from the February 2002 incident and would not necessarily have made it "plainly obvious" to the Town at the time that Nieliwocki might have had sexually abusive propensities.  See Brown, 520 U.S. at 412.  Plaintiff has proffered no expert or other testimony linking the previous incident of what Nieliwocki characterized as "mutual horse play" to a future likelihood to commit sexual assault.  Moreover, plaintiff has proffered no evidence that Stupinski's practice of not reviewing personnel files when reappointing constables ever led to previous deprivations of the constitutional rights at issue here, and therefore plaintiff cannot show that the Town was deliberately indifferent to the consequences of Stupinski's hiring practices.

### 3.  Failure to Supervise

Plaintiff suggests that the Town is responsible for failing to supervise Nieliwocki appropriately because Constable Grayeb should have done more to stop Nieliwocki from going back to

Atwood's room.

> An officer who fails to intercede is liable for the
> preventable harm caused by the actions of the other
> officers where that officer observes or has reason to
> know: (1) that excessive force is being used; (2) that
> a citizen has been unjustifiably arrested; or (3) that
> any constitutional violation has been committed by a
> law enforcement official.  In order for liability to
> attach, there must have been a realistic opportunity to
> intervene to prevent the harm from occurring.  Whether
> an officer had sufficient time to intercede or was
> capable of preventing the harm being caused by another
> officer is an issue of fact for the jury unless,
> considering all the evidence, a reasonable jury could
> not possibly conclude otherwise.

Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (internal

citations omitted).  Grayeb, suspicious of his intentions, had

tried to dissuade Nieliwocki from going back to the hotel and to

Atwood's room, and had urged him to leave once he found him

there.  Whether Grayeb could have done more is not at issue, as

Grayeb is not a defendant in this action, and in a § 1983 action

the Town cannot be held liable for Grayeb's alleged failure to

intervene simply on a respondeat superior theory.  Monell v.

Dep't of Social Servs., 436 U.S. 658, 691 (1978) ("[A]

municipality cannot be held liable solely because it employs a

tortfeasor - or, in other words, a municipality cannot be held

liable under § 1983 on a respondeat superior theory.").

For these reasons, there is no dispute of material fact

concerning the Town's training, reappointment or supervision of

Nieliwocki, and plaintiff's Section 1983 evidence against the

Town is insufficient as a matter of law.

**IV.   CONCLUSION**

Accordingly, the Town's motion for summary judgment [Doc. # 53] is GRANTED and the Town is dismissed as a party in this case.

IT IS SO ORDERED.

/s/

_____
JANET BOND ARTERTON
United States District Judge

**Dated at New Haven, Connecticut, this 30th day of March, 2006.**

28