UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

HEATHER L. ATWOOD,              :
    Plaintiff,              :
                       :   Case No. 3:04cv207 (JBA)
v.                             :
                       :
TOWN OF ELLINGTON, ET AL.,     :
    Defendants.             :

### RULING ON DEFENDANT WILLIAM KONIECZNY'S MOTION FOR SUMMARY JUDGMENT [DOC. #101]

Plaintiff Heather L. Atwood brought suit against the Town of Ellington and Constable Michael Nieliwocki on February 5, 2004 asserting claims arising from Nieliwocki's alleged sexual assault of plaintiff on February 9, 2002. On February 8, 2005, plaintiff separately sued Supervising Resident State Trooper William Konieczny (Atwood v. Konieczny, 3:05cv248 (JBA)) under 42 U.S.C. § 1983 for failure to train and supervise and failure to report Nieliwocki's earlier misconduct. This case was consolidated with the lead case for trial. The Town of Ellington was earlier dismissed as a defendant [Doc. #88]. Defendant Konieczny's Motion seeks summary judgment on the following grounds: expiration of the statute of limitations on Counts One, Two, and Four; and qualified immunity on all counts [Doc. #101]. For the following reasons, defendant's Motion is denied on the statute of limitations grounds and granted on qualified immunity grounds.

1

**I. Factual Background**

As part of Connecticut's system of providing public safety services to towns without organized police departments, a town can purchase the services of "resident troopers" and/or a resident trooper supervisor from the Department of Public Safety (DPS) of the Connecticut Division of State Police, and hire local officers or constables as needed.  (Pl. 56(a)(2) [Doc. #105-4] ¶ 3.)  Under this arrangement, Defendant Konieczny, a 28-year employee of DPS, served as a resident trooper in the Town of Ellington, Connecticut from 1985 to 1997 (id. ¶ 2).  In 1997, he was promoted to the rank of sergeant and worked as a patrol supervisor at the Danielson State Police barracks from 1997 to May 2000 (id.).  He then returned to Ellington in May 2000 to become resident trooper supervisor, which position he occupied at the time of the events underlying this lawsuit.  (Id. ¶¶ 1, 2.)

At the time of Nieliwocki's alleged sexual assault of plaintiff, a two-year Resident Trooper Contract (July 1, 2001 to June 2003) was in place between DPS and Ellington.  (See Contract, Def. Ex. 1.)  This agreement gave "the Division of State Police the authority to supervise and direct the law enforcement operations of appointed constables and police in the Town," and provides that "[a]ll town police officers/constables shall be subject to the applicable provisions of the current

Administration and Operations Manual" ("A&O Manual") of DPS.
(Id. at 1.)  As the resident trooper supervisor, defendant "had
authority to investigate complaints" against but not to
discipline local non-DPS officers.  (Pl. 56(a)(2) ¶ 6.)

Nieliwocki was a part-time local officer, or constable, for
Ellington from 1991 (id. ¶ 9) until his discharge in October 2003
(Nieliwocki Dep., Pl. Ex. A, at 11).  During his tenure, he was
recognized in 1994 and 2001 for his contributions in eliminating
drunk-driving and was commended for assisting in the execution of
a drug-related search warrant in 1995.  (Pl. 56(a)(2) ¶ 9.)  On
the other hand, Nieliwocki had complaints filed against him by
civilians in 1992, 1993, 1995, and 1996,[1] and was held to account
for minor infractions of police procedure in 1991, 1993, 1995,
and 1998.  (See Explanatory Reports, Pl. Ex. K.)  He was also
required to explain 13 instances of tardiness or failure to show

---

[1] A complaint from May 30, 1992 arose from a dispute over whether
Nieliwocki and the Marine Officers with whom he was policing the
Crystal Lake boat watch were in charge of clearing out illegal
buoys.  (See 5/30/92 Interdepartmental Message, Pl. Ex. K.)  In
April 1993,  a complaint was filed stemming from how Nieliwocki,
in conjunction with staff from the Crystal Lake Fire Department,
responded to a bonfire set by a group of minors.  (See 4/13/93
Interdepartmental Message et seq., Pl. Ex. K.)  In 1995, a woman
complained that Nieliwocki had screamed at her and two other
swimmers to whom Nieliwocki issued tickets for simple trespass.
(See 7/31/95 Observation Report et seq., Pl. Ex. K.)  Finally,
Nieliwocki was accused of verbally harassing African-American
boaters in the course of patrolling Crystal Lake with a Marine
Patrol Officer on July 28, 1996.  (See 7/31/96 typewritten report
by Nieliwocki et seq., Pl. Ex. K.)

for duty between 1990 and 2001.  (<u>See</u> <u>id.</u>)

On or about August 10, 2001, defendant's subordinate state trooper Todd Harmon was contacted by Cindy Rivard and Crystal Tracy concerning "some alledged [sic] conduct by Off. Nieliwocki."  (Harmon Memo, Def. Ex. 2.)  Rivard and Tracy were acquainted with Nieliwocki through their work as volunteer ambulance attendants for the Ellington Volunteer Ambulance Corps. (Pl. 56(a)(2) ¶ 12.)  Tracy and Rivard testified that Nieliwocki once came to volunteer headquarters and "got [ ] very, very upset" that snowmobilers were passing by, so he "t[ook] out his gun and . . . was actually following the snowmobilers and going, Bang bang," pointing his gun "across a public road."  (Rivard Dep., Pl. Ex. H, at 13; Tracy Dep., Pl. Ex. G, at 11.)  They testified that a couple months later (Tracy Dep., Pl. Ex. G, at 11-12), when they had momentarily stopped their ambulance in a parking lot, Nieliwocki came over to the vehicle and handcuffed Tracy to the steering wheel.[2]  (<u>Id.</u> at 8; Rivard Dep., Pl. Ex. H,

_____

[2] According to Tracy, Nieliwocki "came over to the driver's side of the window" and "proceeded to put one handcuff on [her] left arm and the other on the bottom of the steering wheel."  (Tracy Dep., Pl. Ex. G, at 8.)  Tracy then "proceeded to tell him that [she] was not kidding; that [she] would like him to take off the handcuffs; that [she] did not feel very comfortable.  He proceeded to then tighten the handcuff and say, I'll take it off when you're going to be a good girl."  (<u>Id.</u> at 9.)  Konieczny denied knowledge of the details of this exchange, including the "good girl" comment, and believed the incident not to be sexual in nature.  (Konieczny Dep., Pl. Ex. J, at 29.)
In addition to this incident, Rivard testified that

at 20, 21, 23.)   Third, Rivard testified, "numerous times he
would take out [his] pepper spray and threaten to spray me" in
the ambulance barn (Rivard Dep., Pl. Ex. H, at 17).

When Rivard and Tracy first reported this behavior to
Harmon, they did not wish to pursue formal complaints.  (Pl.
56(a)(2) ¶¶ 12, 13.)   On the same day Harmon spoke with the two
women, he "advised" Nieliwocki "not to have any contact" with
Rivard or Tracy.  (Harmon Memo, Def. Ex. 2).  Nieliwocki called
the actions "mutual horse play" and vowed to "straighten things
out with Crystal and Cindy."  (Id.)  Harmon spoke with Konieczny
about these matters on or about August 11, 2001 (Pl. 56(a)(2) ¶
12) and memorialized his account in a memo to Konieczny on August
17, 2001 (see Harmon Memo, Def. Ex. 2).  After receiving Harmon's
report, Konieczny called Rivard at the ambulance headquarters to
speak with her about the complaint she made against Nieliwocki.
(Pl. 56(a)(2) ¶ 17.)  Rivard "discussed the weapon, the pepper
spray, and the handcuffs" with Konieczny (Rivard Dep., Pl. Ex. H,
at 31) but did not want to file a formal complaint; she "just
wanted it so that [Konieczny], as [Nieliwocki's] superior, could
just speak to Nieliwocki" (id. at 27).  It was defendant's view

_____

Nieliwocki "handcuffed [Tracy's] hands behind her back" "within a
couple months" of the parking lot incident.  (Rivard Dep., Pl.
Ex. H, at 29.)  However, Tracy denied having been handcuffed by
Nieliwocki "at any other time other than what occurred in the
ambulance."  (Tracy Dep., Pl. Ex. G, at 11.)

that: "Neither of the girls didn't want anything done [sic].
What they wanted to do was just keep [Nieliwocki] from coming to
the ambulance building unless he's there on official business."
(Konieczny Dep., Pl. Ex. J, at 17.)

Rivard explained her unwillingness to file a complaint
against Nieliwocki:

> He is a big man and he could overpower — we just didn't
> want him to come after us. . . .  Pulling a gun out and
> pulling mace out and handcuffing a person would give me
> reason to not trust that person. . . . he kept stating
> his father was a very prominent police officer. . . .
> That if I were to report it, that nobody would believe
> me, they would believe him.

(Rivard Dep., Pl. Ex. H, at 41.)  Harmon testified: "[I] advised
[Nieliwocki] not to go [to the ambulance headquarters] . . .
[but] I was advised the next day that he did in fact go there
after I got off shift."  (Harmon Dep., Pl. Ex. D, at 35.)
According to Rivard, "a couple days later after he was told not
to come on the property, Officer Nieliwocki came on the property.
We hid for a while, and . . . that night or the following week,
[he] stated that he was coming up to apologize to Crystal for
what was going on because Trooper Harmon spoke with him."
(Rivard Dep., Pl. Ex. H, at 25.)  Crystal stated, "we didn't want
to have any contact with him.  We didn't want to hear his
opinions or his apologies on the situation.  We just didn't want
to have any contact whatsoever."  (Tracy Dep., Pl. Ex. G, at 12.)

No further complaints or negative reports were filed against Nieliwocki from mid-August 2001 until early February 2002, when the events surrounding Nieliwocki's alleged sexual assault of plaintiff occurred.  The following summary,[3] which is essentially undisputed, is taken from the DPS Investigative Report.  (See Internal Affairs report, Def. Ex. O, § 3.)  In the early morning hours of February 9, 2002, plaintiff, her sister Megan Atwood, Megan's boyfriend Justin Saucier, and their friend Aaron Stachowiak were at Cuippiano's Bar in Ellington celebrating Megan's 21st birthday.  (Id. § 3 at 4, 19.)  Nieliwocki was on duty, patrolling the parking lot of the bar between 12:30 and 1:00 a.m. when he observed Megan and Heather, both intoxicated, "having a verbal altercation."  (Id. at 4, 16.)  He called Constable Joseph Grayeb for reinforcement at 1:10 a.m., who arrived at the scene to find plaintiff "'bombed'" and "swaying so bad that she had to lean up against the vehicle to keep from falling."  (Id. at 10.)  Two resident troopers, Robert Palmer and Louis Kmon, also arrived.  (Id. at 20.)  It was decided the officers would separate the Atwood sisters: Grayeb would transport Megan and Justin to Megan's home in Ellington and

---

[3] A comprehensive description is found in the Court's Ruling on Town of Ellington's Motion for Summary Judgment, 427 F. Supp. 2d 136 (D.Conn. 2006).

Nieliwocki would transport plaintiff Heather Atwood to a hotel in Vernon, Connecticut.  (<u>Id.</u> at 10.)

Nieliwocki took plaintiff to the Holiday Inn in Vernon and checked her into a room using her credit card.  (<u>Id.</u> at 3.)  He stated that he escorted her to the room, and that after she "made a pass at him" he "told her that he would be getting off duty" later.  (<u>Id.</u> at 17.)  At 2:05 a.m., Grayeb, Palmer, and Kmon were dispatched to respond to a "domestic disturbance" at Megan's house, where they arrested Megan.  (<u>Id.</u> at 10.)  Grayeb and Nieliwocki returned from their respective locations to the resident trooper's office before concluding their shift at 3:00 a.m.  (<u>Id.</u> at 11.)  As Grayeb was driving home, "he got a 'gut feeling' that Nieliwocki was going back to the hotel in Vernon . . . [and] then drove to the hotel to check."  (<u>Id.</u>)  He observed Nieliwocki "hand the keys to the clerk in the lobby" and then "advised him not to go up to . . . where Heather was because she was 'really bombed.'" (<u>Id.</u>)  Nieliwocki did "follow[] Grayeb until he got onto the highway" (<u>id.</u> at 18), at which point he called Heather on her cell phone, whose number he had obtained at some point (<u>id.</u> at 17), and "agreed to meet with her and [ ] returned to the hotel" (<u>id.</u> at 18).

It is undisputed that plaintiff and Nieliwocki then engaged in sexual relations, but there is vigorous dispute as to whether

8

it was consensual.  Plaintiff stated that she woke up "lying on the bed naked with the exception of her socks.  She stated that she felt soreness in her vagina area and had bruises on her legs and inner thighs.  She stated that she had something in her hair which she thought to be semen."  (Id. at 3.)  By Nieliwocki's telling, when he returned to the hotel room, plaintiff wanted to engage in intercourse and "began to perform oral sex on him.  He stated that she then began to tell him to 'f*** her.'"  (Id. at 18.)

Justin Saucier reported that Megan returned from jail at 9:00 a.m., and that "Heather started calling the house from the Holiday Inn Express in Vernon and was looking for a ride home. . . . he picked her up at the hotel room and [ ] the first thing she stated when he arrived at the door of the room was that she thought she had been raped."  (Id. at 6.)  The Vernon Police Department investigated the incident from February 9, 2002 to November 7, 2002, and then again from November 15, 2002 to January 31, 2003 based on new evidence, but ultimately determined that the evidence was insufficient to press criminal charges against Nieliwocki.  (Id. at 19.)

Konieczny was not on duty the night of the incident (Pl. 56(a)(2) ¶ 24) and first learned on February 12, 2002 what had transpired between Atwood and Nieliwocki from Lieutenant Thomas

9

Davoren, Commanding Officer of Troop C, which services Ellington. (Pl. 56(a)(2) ¶ 23; Konieczny Aff., Def. Ex. A, ¶ 23.)  Davoren filed a formal complaint against Nieliwocki on February 13, 2002, alleging possible "Conduct Unbecoming an Officer, in violation of section 14.2.b(20) of the [A&O] Manual."  (Internal Affairs report, Def. Ex. O, § 2 at 2.)[4]  After being informed of this, Konieczny contacted Ellington First Selectman Michael Stupinski and Nieliwocki about the pending complaint.  Stupinski suspended Nieliwocki's police powers on February 15, 2002.  (Stupinski Dep., Pl. Ex. E, at 41.)

The DPS internal affairs investigation concluded on May 8, 2003 with a finding of "Conduct Unbecoming an Officer" against Nieliwocki.  (Internal Affairs report, Pl. Ex. O, § 3 at 22.) His employment with the Town was terminated by the Board of Selectmen on October 15, 2003.  (Pl. 56(a)(2) ¶ 35.)

**B. Procedural background**

In the Amended Complaint [Doc. #91], plaintiff claims that defendant Konieczny violated her constitutional right to be free from Nieliwocki's assault by failing to train Nieliwocki (Count One); by failing to train Grayeb (Count Two); by failing to supervise Nieliwocki (Count Three); and by failing to report

---

[4] This provision reads: "No sworn officer shall perform any act which is detrimental to the department."  (A&O Manual, Pl. Ex. C, § 14.2.2.b(20).)

Nieliwocki's earlier "misconduct" to Town officials (Count Four).

Defendant seeks summary judgment on all four counts.  He argues

that Counts One, Two, and Four are barred by the statute of

limitation, and that the doctrine of qualified immunity requires

dismissal of Counts One, Two, Three, and Four.

## II. Standard

Summary judgment is appropriate under Federal Rule of Civil

Procedure 56(c) when the moving party establishes that there is

no genuine issue of material fact to be resolved at trial and

that the moving party is entitled to judgment as a matter of law.

See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Materiality

is determined by the substantive law that governs the case.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In

this inquiry, "[o]nly disputes over facts that might affect the

outcome of the suit under the governing law will properly

preclude the entry of summary judgment."  Id.  "Where the record

taken as a whole could not lead a rational trier of fact to find

for the nonmoving party, there is no genuine issue for trial."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586 (1986).

The movant's burden of establishing that there is no genuine

issue of material fact in dispute will be satisfied if he or she

can point to an absence of evidence to support an essential

11

element of the non-moving party's claim.  Celotex, 477 U.S. at
322-23.  "A defendant need not prove a negative when it moves for
summary judgment on an issue that the plaintiff must prove at
trial.  It need only point to an absence of proof on plaintiff's
part, and, at that point, plaintiff must 'designate specific
facts showing that there is a genuine issue for trial.'" Parker
v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001)
(quoting Celotex, 477 U.S. at 324; see also Gallo v. Prudential
Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994)) ("[T]he
moving party may obtain summary judgment by showing that little
or no evidence may be found in support of the nonmoving party's
case.").  The non-moving party, in order to defeat summary
judgment, must then come forward with evidence that would be
sufficient to support a jury verdict in his or her favor.
Anderson, 477 U.S. at 249 ("[T]here is no issue for trial unless
there is sufficient evidence favoring the nonmoving party for a
jury to return a verdict for that party").  In making this
determination, the Court draws all reasonable inferences in the
light most favorable to the party opposing the motion.
Matsushita, 475 U.S. at 587.  However, a party opposing summary
judgment "may not rest upon the mere allegations or denials of
the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some

metaphysical doubt as to the material facts" is insufficient. Id. at 586 (citations omitted).

On the other hand, "[i]f reasonable minds could differ as to the import of the evidence ... and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain [] summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations, alterations, and quotations omitted).

## III. Discussion

### A. Statute of limitations applicable to Counts One, Two, and Four

Plaintiff's original Complaint filed February 8, 2005 [Doc. #1, No. 3:05cv248] consisted of two counts against defendant. Following a conference with counsel on April 3, 2006, the Court gave plaintiff leave to file an amended complaint. (See Sched. Order [Doc. #90].) Defendant maintains that plaintiff's Amended Complaint [Doc. #91], which consists of four counts, includes claims that were "not contained in the original complaint, run[ning] afoul of the statute of limitation" (Def. Mem. [Doc. #103] at 6) in violation of Fed. R. Civ. P. 15(c), which provides in relevant part:

An amendment of a pleading relates back to the date of

13

the original pleading when
    (1) relation back is permitted by the law that
provides the statute of limitations applicable to the
action, or
    (2) the claim or defense asserted in the amended
pleading arose out of the conduct, transaction, or
occurrence set forth or attempted to be set forth in
the original pleading, . . .

As 42 U.S.C. § 1983 does not include a statute of limitation

provision, subsection (c)(2) of Rule 15 is the basis of

defendant's statute of limitations argument.

It is well established that "[t]he statute of limitations

applicable to claims brought under . . . § 1983 in Connecticut is

three years." <u>Lewis v. Conn. Dep't of Corr.</u>, 355 F. Supp. 2d

607, 621 (D. Conn. 2005) (MRK) (citing <u>Walker v. Jastremski</u>, 159

F.3d 117, 119 (2d Cir. 1998); <u>Holt v. KMI-Continental, Inc.</u>, 95

F.3d 123, 131 (2d Cir. 1996)).  Thus, the claims related to the

unconstitutional assault by Nieliwocki alleged to have occurred

on February 9, 2002 needed to have been brought by February 9,

2005, and plaintiff's original Complaint against defendant was

filed within the statute of limitations on February 8, 2005.  The

Amended Complaint [Doc. #91], filed April 10, 2006, contains

timely claims only if they are determined to have "ar[isen] out

of the conduct, transaction, or occurrence set forth or attempted

to be set forth in the original pleading," Fed. R. Civ. P.

15(c)(2).

"Whether a new claim 'arguably arises out of the same "transaction or occurrence"' as the one that the plaintiff originally alleged, and thus an amended pleading setting forth that claim can be said to relate back to the original complaint, lies in the district court's discretion." <u>Wilson v. Fairchild Republic Co.</u>, 143 F.3d 733, 738 (2d Cir. 1998) (quoting <u>Leonelli v. Pennwalt Corp.</u>, 887 F.2d 1195, 1199 (2d Cir. 1989)).  In his Motion, defendant argues that the original Complaint included no allegation that defendant failed to train Nieliwocki or Grayeb, no reference to what kind of training could have prevented the harm to plaintiff, and no allegation that defendant failed to report Nieliwocki's previous misconduct.  (Def. Mem. at 6.)

### 1. Count One: Failure to Train Nieliwocki

Defendant's contention that the Complaint did not originally allege that defendant failed to train Nieliwocki is baffling since the relevant paragraphs read virtually identically in the Complaint and Amended Complaint: "During all times pertinent to this action, defendant Konieczny was in charge of the training and supervision of nine Constables of the Town of Ellington, including Constable Michael Nieliwocki" (Compl. [Doc. #¶ 5; Am. Compl. ¶ 6); "Defendant Konieczny's failure to train Constable Nieliwocki amounted to a deliberate indifference to the

15

constitutional rights of the plaintiff" (Compl. at Count 1 ¶ 75; Am. Compl. ¶ 80.); "Had defendant Konieczny adequately trained Constable Nieliwocki, the plaintiff would not have been transported to a motel where she was placed in imminent danger . . ." (Compl. at Count 1 ¶ 76; Am. Compl. ¶ 81.)  Thus, Count One, having been plead in the original Complaint, is not barred by the statute of limitations.

### 2. Count Two: Failure to Train Grayeb

Plaintiff claims that her Amended Complaint only "attempt[s] to clarify her claims involving the defendant's failure to train and failure to supervise, by specifying the manner in which he failed to do so."  (Pl. Opp. Mem. [Doc. #105] at 6.)  The Complaint, plaintiff argues, "alleged . . . a failure to train . . . constables [defendant] was responsible for, including Nieliwocki and Grayeb."  (Id.)  It is alleged in the Complaint: "During all times pertinent to this action, defendant Konieczny was in charge of the training and supervision of nine Constables of the Town of Ellington, including Constable Michael Nieliwocki" (Compl. ¶ 5).  The phrase "and Constable Joseph Grayeb" is added in the Amended Complaint.  (See Am. Compl. ¶ 6.)  Also presented for the first time in the Amended Complaint: "Defendant Konieczny's failure to train Constable Joseph Grayeb amounted to

a deliberate indifference to the constitutional rights of the plaintiff" (Id. at Count 2 ¶ 80); "Had defendant Konieczny adequately trained Constable Joseph Grayeb to report any suspicious and irregular conduct of other Constables, particularly Constable Nieliwocki, to the State Troopers on duty, rather than attempting to handle it himself, the plaintiff would not have been subject to the offensive contact by Constable Nieliwocki, including physical and sexual misconduct" (Id. at Count 2 ¶ 81.)

While the original Complaint consists of two counts which specifically reference defendant's failures to train and supervise Nieliwocki, the added claim in the Amended Complaint of defendant's failure to train Grayeb parallels that pertaining to Nieliwocki and arises from the same occurrence described in the Complaint, namely Grayeb's ineffective effort to preventively intervene in Nieliwocki's conduct on February 9, 2002.  Plaintiff apparently viewed the additional factual allegations in the Amended Complaint — that Grayeb "had a gut feeling that Constable Nieliwocki was going back to the Motel where he had left the plaintiff" (Am. Compl. ¶ 40) but that Grayeb "did not contact any supervisory State Troopers on duty" (id. ¶¶ 40, 47) — as another manifestation of the consequence of defendant's failure to train

17

Grayeb also based on the events described in the original Complaint.  Thus, this is not a case "[w]here the amendment would involve a new cause of action;" rather, "'the original complaint gave the defendant fair notice of the newly alleged claims.'" O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 68 (2d Cir. 2002) (citing Wilson v. Fairchild Republic Co., 143 F.3d 733, 738 (2d Cir. 1998)).

### 3. Count Four: Failure to report Nieliwocki's prior misconduct

Plaintiff sought to amend her Complaint against defendant based on new information disclosed during discovery regarding Nieliwocki's interactions with Rivard and Tracy.  (See Def. Mem. at 6, referencing conference with parties on Apr. 3, 2006.) These wholly new factual allegations appear in paragraphs 75 to 77 and 79 (Am. Compl. at 10), and are the basis for the claim that Konieczny is liable for "fail[ing] to report Constable Nieliwocki's misconduct described in paragraph 75 and 76 above, through the chain of command to other State Troopers" (id. at Counts Three & Four ¶ 82), and that "[h]ad defendant Konieczny . . . inform[ed] other State Troopers on the scene at Cioppinno's on February 9, 2002, through their chain of command, that Constable Nieliwocki subjected other females he came into contact with as a Town Constable to offensive physical contact, . . .

18

they would have been on notice that Nieliwocki was engaging in acts of aggression and violence against women" (id. at Counts Three and Four ¶ 83).

While the "failure to report" is superficially distinct from the "failure to supervise" (Count Three), these claims in the Amended Complaint overlap considerably, even sharing paragraphs or large sections of paragraphs.  (See Am. Compl. at Count Three ¶¶ 82-85, Count Four ¶¶ 81-84.)  The failure to report claim is distinct only in the type of opportunity defendant allegedly had to act upon the information provided to him regarding Nieliwocki's history with Rivard and Tracy, which action is claimed would have been potentially a prophylactic against what befell plaintiff.  While the Rivard and Tracy incidents were not known to plaintiff when the original Complaint was drafted, that Complaint did claim that "during his service as a Town Constable prior to February 9, 2002, Constable Nieliwocki subjected other female detainees of the Town of Ellington to sexual and physical abuse, as well as other females he came into contact with as a Town Constable.  This fact was known, or in the exercise of reasonable care, should have been known to defendant Konieczny." (Compl. at Count Two ¶ 74.)  Similarly, Count Four of the Amended Complaint alleges: "Constable Nieliwocki subjected other females

he came into contact with as a Town Constable to offensive physical contact, . . . [and] was engaging in acts of aggression and violence against women, to include physical and sexual misconduct." (Am. Compl. at Count Four ¶ 82.) Because of the overlap between these factual allegations, and because the original Complaint alleged that "Defendant Konieczny did not take any corrective action against Constable Nieliwocki demonstrating his failure to supervise or monitor the activities of Constable Nieliwocki during the time he was a Town Constable" (Compl. at Count Two ¶ 75), which "corrective action" includes reporting misconduct for disciplinary action, defendant was put on notice by the original Complaint of the failure to report claim in Count Four of the Amended Complaint.

As Counts One, Two, and Four satisfy the relation-back principle of Fed. R. Civ. P. 15(b)(c), defendant's Motion is denied on the ground of statute of limitations.

**B. Qualified immunity as to all counts**

Defendant also seeks summary judgment based on the doctrine of qualified immunity on Counts One through Four. "The qualified immunity doctrine shields 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person
would have known.'"  Lewis v. Cowen, 165 F.3d 154, 166 (2d Cir.
1999) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).
In other words, the doctrine applies "if their actions were
objectively reasonable, as evaluated in the context of legal
rules that were 'clearly established' at the time."  Poe v.
Leonard, 282 F.3d 123, 132 (2d Cir. 2002).  Officials have an
"entitlement not to stand trial or face the other burdens of
litigation, conditioned on the resolution of the essentially
legal question whether the conduct of which the plaintiff
complains violated clearly established law.  The entitlement is
an immunity from suit rather than a mere defense to liability;
and like an absolute immunity, it is effectively lost if a case
is erroneously permitted to go to trial."  Mitchell v. Forsyth,
472 U.S. 511, 526 (1985) (emphasis in original).

Application of the doctrine utilizes a two-step inquiry.
First on the facts alleged, did plaintiff suffer violation of a
constitutional right that was clearly established at the time it
was violated?  See Saucier v. Katz, 533 U.S. 194, 200-01 (2001).
The second part of this inquiry "must be undertaken in light of
the specific context of the case," id. at 201, and asks "whether
it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted," id. at 202.[5]  In the
context of supervisory liability, as here, there is an additional
part to the first step of the inquiry; not only must the right
violated have been clearly established, but the theory under
which the supervisor may be held liable must also have been
clearly established.  See Poe, 282 F.3d at 140 (citing Johnson v.
Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d Cir. 2001)).

### 1.  Existence of Clearly Established Right

#### a.  Alleged violation by Nieliwocki of a clearly established constitutional right

In Poe, the Second Circuit considered whether defendant
Leonard, the supervisor of Connecticut state trooper Pearl, was
qualifiedly immune from liability under § 1983 for his failure to
supervise or investigate his subordinate's unconstitutional
conduct of secretly videotaping Poe, a female actor shooting a
police training video, undressing in the dressing room.  See 282
F.3d 123.  Although Leonard had viewed a crime scene training
video shot by Pearl "with its overlong focus on the civilian

_____

[5] The second step of the qualified immunity inquiry applies only
if the underlying constitutional right and the theory of
supervisory liability were clearly established at the time of the
alleged violation.  If so, "defendants are still entitled to
qualified immunity if it was objectively reasonable for them to
believe their actions were lawful" or if reasonable officers
could disagree. See Weaver v. Brenner, 40 F.3d 527, 537 (2d Cir.
1994).

victim's upper high region, and learned of Pearl's desire for Poe to show 'a lot of cleavage' in her video," id. at 145, he had no knowledge about a previous incident in which Pearl had "photograph[ed] several young women in swimsuits in a private bedroom while filming a public safety announcement," id. at 127, or another in which "a woman filed a formal complaint against Pearl, alleging that he made 'numerous unwanted and improper advances' toward her and improperly touched her" while he was on duty, id.  The Second Circuit determined that there was insufficient evidence "to raise a triable issue of fact as to whether Leonard knew or should have known that there was a high degree of risk that Pearl would behave inappropriately with a woman during his assignment, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to Poe," id. at 142.

Poe's conclusion that plaintiff's claim was "appropriately analyzed pursuant to the Fourteenth Amendment's guarantee of substantive due process" applies with equal force here.  See 282 F.3d at 137 (citing Johnson, 239 F.3d at 251-52 (analyzing a student's claim of excessive force by a teacher under Fourteenth

Amendment substantive due process); <u>Haberthur v. City of Raymore</u>, 119 F.3d 720, 723-24 (8th Cir. 1997) (analyzing plaintiff's claim of sexual assault by a police officer under substantive due process); <u>Jones v. Wellham</u>, 104 F.3d 620, 628 (4th Cir. 1997) (analyzing plaintiff's claimed rape by a police officer under substantive due process)); <u>see also</u> <u>United States v. Giordano</u>, 442 F.3d 30, 47 (2d Cir. 2006) (holding that minor women had Fourteenth Amendment right to be free from sexual abuse by mayor); <u>Spencer v. Doe</u>, 139 F.3d 107, 112 (2d Cir. 1998) (denying motion to dismiss where state actors had a duty to protect juvenile detainee from sexual molestation under Fourteenth Amendment).

"[T]he absence of an identical factual scenario does not necessarily yield a conclusion that the law is not clearly established." <u>Johnson</u>, 239 F.3d at 251. "[D]etermining whether a right is 'clearly established' is not subject to mathematical precision. <u>Id.</u> (citing <u>LaBounty v. Coughlin</u>, 137 F.3d 68, 73 (2d Cir. 1998)). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to

24

say that in the light of pre-existing law the unlawfulness must
be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987)
(citing Mitchell, 472 U.S. at 535 n.12).  It is clear from Poe,
Johnson, Giordano, and Spencer, and defendant does not dispute,
that Constable Nieliwocki's alleged conduct of sexually
assaulting a woman he had housed in a motel because of her
extreme intoxication, if proved, would constitute a violation of
plaintiff's substantive due process right to bodily integrity, a
right which was clearly established to a reasonable person as of
February 2002.

> ### b. Clearly established theory of supervisory
> ###    liability: grossly negligent supervision

In the Second Circuit, not only the officer directly
responsible for the constitutional deprivation, but also that
officer's supervisor, may be liable for constitutional violations
under § 1983:

> a supervisor may be found liable for his deliberate
> indifference to the rights of others by his failure to
> act on information indicating unconstitutional acts
> were occurring or for his gross negligence[6] in failing

---

[6] While "gross negligence" and "deliberate indifference" have been
used interchangeably in the supervisory liability context, see,
e.g., Meriweather v. Coughlin, 879 F.2d 1038, 1048 (2d Cir. 1989)
("[S]upervisory liability may be imposed when an official has
actual or constructive notice of unconstitutional practices and
demonstrates 'gross negligence' or 'deliberate indifference' by
failing to act.") (citing McCann v. Coughlin, 698 F.2d 112, 125
(2d Cir. 1983)), Poe notes that these terms "represent different

to supervise his subordinates who commit such wrongful
acts, provided that the plaintiff can show an
affirmative causal link between the supervisor's
inaction and her injury.

Poe, 282 F.3d at 140 (citing Johnson, 239 F.3d at 254).  The

supervisor's liability cannot be vicarious; instead, the

supervisor must have been personally involved:

> Personal involvement of defendants in alleged
> constitutional deprivations is a prerequisite to an
> award of damages under § 1983. . . .  Personal
> involvement of a supervisory official may be
> established "by evidence that: (1) the [official]
> participated directly in the alleged constitutional
> violation, (2) the [official], after being informed of
> the violation through a report or appeal, failed to
> remedy the wrong, (3) the [official] created a policy
> or custom under which unconstitutional practices
> occurred, or allowed the continuance of such a policy
> or custom, (4) the [official] was grossly negligent in
> supervising subordinates who committed the wrongful
> acts, or (5) the [official] exhibited deliberate
> indifference to the rights of [others] by failing to
> act on information indicating that unconstitutional
> acts were occurring."

Johnson, 239 F.3d at 254 (citing Colon v. Coughlin, 58 F.3d 865,

873 (2d Cir. 1995)).

Of the five types of personal involvement outlined above,

only the fourth category — (4) gross negligence in supervising

subordinate who committed the wrongful act[7] — is reflected in the

---

degrees of intentional conduct on a continuum," 282 F.3d at 140
n.14 (citing cases).

[7] The fifth category — deliberate indifference to the rights of
others by failing to act on information indicating that

allegations of the four counts of plaintiff's Amended Complaint against Konieczny alleging gross negligence in supervision, training, and reporting.[8]

"We have often equated gross negligence with recklessness, and have defined it as the 'kind of conduct . . . where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.'" Poe, 282 F.3d at 140 (citing inter alia Bryant v. Maffucci, 923 F.2d 979, 985 (2d Cir. 1991)).  In Poe, a supervisor's "failure to inquire" about his subordinate's prior reported misbehavior was analyzed under a theory of grossly negligent supervision:

> [F]or a supervisor to be liable under section 1983 for his failure to inquire, he must first have been on notice that his subordinate was prone to commit some unconstitutional or unacceptable behavior.  Such notice could be actual (for example, awareness of prior deprivations in a related context), or it could be

---

unconstitutional acts were occurring — does not describe plaintiff's claims against defendant, because plaintiff's theory of supervisory liability is predicated on defendant's knowledge of Nieliwocki's conduct toward Rivard and Tracy, not plaintiff, which is not claimed to have been unconstitutional.

[8] Plaintiff does not argue that defendant failed to discipline Nieliwocki, for "neither Sergeant Konieczny nor the State Police had the authority to discipline a local Ellington constable. . . . Resident Trooper Supervisor, Sergeant Konieczny had authority to investigate complaints against local officers, . . . . However, imposition of discipline, if warranted, remained the responsibility of the Town."  (Pl. 56(a)(2) ¶ 6.)

constructive (for instance, notice arising from a
preexisting duty).

Id. at 141.  While Poe does not flesh out the meaning of "prone
to commit some unconstitutional or unacceptable behavior," it
found that Leonard was not "on notice" of any previous conduct
that could have predicted Pearl's constitutionally violative
conduct, and that his knowledge of the circumstances of Pearl's
video production did not suffice for "notice."  In explaining the
meaning of this "notice," Poe cites Wright v. McMann, 460 F.2d
126, 134-35 (2d Cir. 1972), which denied qualified immunity to a
prison warden who had received and read letters describing the
"commonplace" practice of inhumane treatment in "strip cells"
that the warden was responsible for operating according to the
Employee Rule Book of the New York State Department of
Corrections.

    In Hernandez v. Keane, 341 F.3d 137 (2d Cir. 2003), the
Second Circuit found that qualified immunity shielded a
supervising prison doctor from Eighth Amendment liability for
indifference to a prisoner's serious medical needs because there
was no showing of any personal responsibility on his part.  "Dr.
Kapoor never examined or diagnosed plaintiff's hand.  And he was
not directly responsible for placing medical holds on patients;
for scheduling treatments or procedures; or for following up on

issues such as physical therapy or 'feed up' passes.  There is no evidence that Dr. Kapoor had notice of, instituted, or became aware of any unconstitutional policy, practice or act, or that he was grossly negligent in supervising his subordinates."  Id. at 145.

"Plaintiff[] must establish [defendant's] deliberate indifference by showing that 'the need for more or better supervision to protect against constitutional violations was obvious,' but that [defendant] made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct."  Amnesty Amer. v. Town of West Hartford, 361 F.3d 113, 127 (2d Cir. 2004) (citing Vann v. City of N.Y., 72 F.3d 1040, 1049 (2d Cir. 1995)).  However, "[e]ven where the need to train or supervise would not be obvious to a stranger to the situation, a particular context might make the need for training or supervision so obvious that a failure to do so would constitute deliberate indifference."  Walker v. City of N.Y., 974 F.2d 293, 297 (2d Cir. 1992) (reversing dismissal by the district court where the plaintiff, who had been falsely imprisoned for 19 years, alleged unconstitutional conduct by the district attorney, which the court found provided a proper basis for municipal liability); see also Woodmansee v. Mickens, No. 04cv1896 (WWE), 2006 U.S. Dist.

LEXIS 24287, at *20-21 (D. Conn. Mar. 22, 2006) (holding that, where plaintiff claimed false arrest and excessive force, "[a] failure to supervise claim may be established by showing that an official deliberately ignored an obvious need for supervision, while a failure to train claim requires plaintiff to establish that an official consciously disregarded a risk of future violations of constitutional rights by his employees") (citing Amnesty Amer., 361 F.3d at 127 n.8); Doe II v. City of Hartford, No. 3:01cv1026 (AHN), 2005 U.S. Dist. LEXIS 21780 (D. Conn. Aug. 22, 2005) (holding that, where defendant police officers had coerced sex from plaintiff prostitute under the threat of arrest, it must be determined whether the record "supports a finding that [defendant supervisor] was required under clearly established law to do more than he did to prevent the alleged constitutional violation").

The four counts of the Amended Complaint, while differentially styled as the failure to train, supervise, and report, are essentially variants of the defendant's alleged gross negligence in supervision.  In Counts One and Two respectively, plaintiff claims that Konieczny failed to train Nieliwocki and Grayeb on how to behave toward "intoxicated or otherwise helpless and/or disabled females at night in the course of [their] duties"

(Am. Compl. ¶ 78) and that "there was training that would have
been appropriate . . . to address Nieliwocki's misconduct" (Pl.
Opp. Mem. at 28).  Count Three claims that defendant failed "to
establish and maintain any oversight and supervision of . . .
Constable Nieliwocki, during the evening hours, despite the
knowledge [of his previous conduct]" (Am. Compl. at Count Three ¶
81) and "notwithstanding notice of [Nieliwocki's] inappropriate
conduct with respect to women that he came into contact with . .
." (Pl. Opp. Mem. at 27).  Count Four alleges that Konieczny
failed to report the misconduct of Nieliwocki with respect to
Rivard and Tracy, constituting gross negligence of the risk to
plaintiff's constitutional rights.

Plaintiff's argument centers on defendant's undisputed
knowledge of the Rivard and Tracy incidents,[9] which plaintiff
argues evinced the constable's persistent offensive contact with
women.  Nieliwocki stated that he never received sexual
harassment training from the Town (Nieliwocki Dep., Pl. Ex. A, at

---

[9] Other misbehavior by Nieliwocki that Konieczny was aware of
because he had requested explanatory reports were eight-years-old
and/or had no bearing on Nieliwocki's alleged proclivities toward
women.  (On April 28, 1994, Nieliwocki improperly assumed
responsibility for a case, failing to file timely reports, and
failing to respond to messages and "ma[king] no attempt to
contact this office;" and on July 18, 2001, he "failed to show up
for a scheduled evening shift."  (Explanatory Reports, Def. Ex.
K.))

74), despite the existence of a sexual harassment policy in the
A&O Manual (<u>see</u> A&O Manual, Pl. Ex. C, § 4.1.4); he also stated
that he "was never informed" that he would be "supervised more
closely" by Harmon or anyone else following report of the Tracy,
Rivard, and snowmobile incidents (Nieliwocki Dep., Pl. Ex. A, at
64).  Plaintiff's expert witness John J. Ryan, who formulates
policies and consults for law enforcement agencies as Co-director
of the Legal and Liability Risk Management Institute and as an
independent trainer of the Public Agency Training Council, opined
that Nieliwocki "show[ed] propensities for violence and
aggression against women" (Ryan Dep., Pl. Ex. F, at 73) and that:
"There's certainly an issue of violence and aggression against
[Tracy and Rivard], and that's certainly consistent with the
pattern that followed up when Constable Nieliwocki had non
consensual sex with Heather Atwood"  (<u>id.</u> at 94-95).  Moreover,
Ryan testified that defendant "had a supervisory obligation at
the outset that had a nexus to what ultimately occurred in this
case," namely the incident with plaintiff (<u>id.</u> at 77), and that
Nieliwocki's act of going back to the ambulance barn after being
told not to do so "was an insubordination sufficient enough to
warrant a formal Internal Affairs Investigation" (<u>id.</u> at 66)[10]

[10] The A&O Manual details when and how discipline should be meted
out, <u>i.e.</u>, what kind of violation requires an internal affairs

and "should have been turned over and brought to the attention of [the] Town" (id. at 75).  In addition to the opinion of Ryan, plaintiff points to the testimony of defendant's expert witness Police Captain Robert Tolomeo that he "would have recommended to the Town that [Nieliwocki] go for some training and to realize [sic] that even though it might not be sexual harassment, it's unprofessional" (Tolomeo Dep., Pl. Ex. B, at 89), as well as the testimony of Trooper Palmer, who stated that he "would have had some concerns about [Nieliwocki's being] alone with a female" had he known about the Rivard and Tracy incidents (Palmer Dep., Pl. Ex. M, at 19).

One thrust of defendant's qualified immunity argument is that "there is lacking a causal connection between Sergeant Konieczny's job-related reporting responsibilities and Officer Nieliwocki's off-duty misconduct."  (See Def. Mem. at 25.) Defendant argues that "Officer Nieliwocki's uncontradicted, self-professed 'rough-housing' and 'horse-play' with the two ambulance attendants, however, [sic] misguided, hardly served to put

---

investigation as opposed to the less serious administrative inquiry.  (See A&O Manual, Pl. Ex. C, §§ 5.1, 5.2.)  Section 4.1.4(a)(1) of the Manual states that, "[e]ach allegation of sexual harassment reported, or any incident which otherwise comes to the attention of any supervisor or manager which may reasonably constitute sexual harassment shall be promptly investigated, documented and, if found to be factual, shall be remedied immediately." (Id. § 4.1.4 (emphasis added).)

Sergeant Konieczny on notice with regard to the sort of violent
sexual misconduct the plaintiff would have us believe occurred."
(Def. Mem. at 24.)   Captain Tolomeo's testimony that "no amount
of retraining would have or could have prevented the criminal
sexual assault that Officer Nieliwocki committed on the
Plaintiff" (Tolomeo Dep., Pl. Ex. B, at 68) was contrary to
Ryan's testimony "that training could have been one of the
deterrent effects from future conduct consistent with [the Rivard
and Tracy incidents]" (Ryan Dep., Pl. Ex. F, at 88-89).  Tolomeo
was of the view that the Tracy and Rivard incidents to be "minor"
and not rising "to the level of misconduct" (Tolomeo Dep., Pl.
Ex. B, at 60, 91), that the decision to report up the chain of
command is highly discretionary and only required for "serious
misconduct" (id. at 52), and that "in [his] opinion, no,
[Konieczny] would not be required to report it" (id. at 105).
Defendant did not "consider[] the report to warrant anything more
than additional counseling and a proper notation in Officer
Nieliwocki's annual performance evaluation"[11] (Konieczny Aff.,

---

[11] Konieczny wrote in Nieliwocki's 2001 evaluation: "A review of
his file reveals that Tpr. Harmon counseled Constable Nieliwocki
for his conduct at the Ellington Ambulance building.  Although
there was never a formal complaint made [sic].  Constable
Nieliwocki was told not to return there, Constable Nieliwocki's
judgment was poor and the matter was resolved without further
incidents."  (Performance Evaluation, Def. Ex. 3, at 2.)

Def. Ex. A, ¶ 19), as he did not interpret the handcuffing incident reported by Rivard as sexual harassment, which would require reporting pursuant to the A&O Manual (see Konieczny Dep., Pl. Ex. J, at 22-23, 29).  Moreover, Konieczny defended as discretionary his deference to Harmon's handling of Nieliwocki vis-à-vis Rivard and Tracy and stated that he believed "Nieliwocki to have heeded the warning."  (Konieczny Aff., Def. Ex. A, ¶ 21.)

While training was within defendant's authority to impose on Nieliwocki and Grayeb, and reasonable jurors could conclude defendant was grossly negligent in not ensuring that Nieliwocki received sexual harassment training or clarifying to State and Town officers acceptable practices regarding housing intoxicated persons, there is no affirmative evidence that any sexual harassment training or training on how to handle intoxicated females would likely have prevented Nieliwocki's conduct toward plaintiff.  Further, as to the claim of failure to train Grayeb in Count Two, because Grayeb was not alleged to have been directly, personally involved in the violation of plaintiff's constitutional rights other than by ineffectively attempting to head Nieliwocki off his intended course, the absence of evidence

of proximate causation is stark.[12]  Because no supervisory

constitutional violation can be proved absent "an affirmative

causal link between the supervisor's inaction and [plaintiff's]

injury," Poe, 282 F.3d at 140, such that defendant could be found

to have known facts creating a high degree of risk of physical

harm to another such as plaintiff, summary judgment must be

granted in defendant's favor on Counts One and Two.

---

[12] At oral argument, plaintiff's counsel claimed that, had Grayeb
been properly trained, he would have reported Nieliwocki's
conduct with respect to Atwood on February 9, 2002.  This alleged
required reporting would have been on either Nieliwocki's housing
plaintiff in a motel or his "gut feeling" about Nieliwocki's off-
duty intentions.  The A&O Manual provides that, "A police officer
who finds any person who appears to be intoxicated by alcohol or
drugs in a public place and who is in need of help may, with the
person's consent, assist that person to his home, a treatment
facility, a hospital or other facility able to accept him."  (A&O
Manual, Pl. Ex. C, § 19.3.9.b(1) (emphasis in original).)  Since
this provision makes no specific reference to the propriety of
using motels, training Grayeb on the A&O Manual provisions would
have been of no consequence on the night of February 9, 2002.
Nor did defendant fail to train on any official policy: defendant
testified that "[t]here's no policy written allowing [constables]
to do that, but there's no policy barring them from doing that,
either." (Konieczny Dep., Pl. Ex. J, at 42.)  While Ryan
criticizes this policy, that deficiency does not lie with
defendant.  Further, whether Grayeb should have reported a "gut
feeling" about Nieliwocki's intentions (as opposed to actual
misconduct by a fellow officer) is not reflected in any A&O
directive or other official policy on which defendant would have
given training.  Moreover, Grayeb acted on his "gut feeling,"
returned to the motel, and got plaintiff to leave.  The record is
devoid of any evidence that Grayeb believed Nieliwocki would
again return to plaintiff at the motel.  Plaintiff has proffered
no evidence that training Grayeb differently would have prevented
Nieliwocki's alleged sexual assault on plaintiff.

Considering next Counts Three and Four, and in the light most favorable to the plaintiff as required, defendant's failures to supervise[13] and report could reasonably be found to be a serious dereliction of supervisory responsibilities.  The record could provide a sufficient basis for reasonable jurors to conclude that Nieliwocki's conduct toward Rivard and Tracy "may reasonably [have] constitute[d] sexual harassment" requiring prompt investigation, documentation and remedial measures (see A&O Manual, Pl. Ex. C, § 4.1.4.a(1)) and that Nieliwocki's defiance of the no-contact order was insubordination requiring internal investigation and/or reporting to the Town for possible discipline.  (See Ryan Dep., Pl. Ex. F, at 66; see also supra note 10.)  At oral argument, plaintiff's counsel clarified that

---

[13] The Court notes that the trooper-constable supervisory structure appeared from the record to be alarmingly unclear to the officers on duty that night.  Trooper Palmer testified that "Konieczny would have been the one who had supervisory authority over [the constables]" (Palmer Dep., Pl. Ex. M, at 21), but because Konieczny was not on duty and because Palmer did not know who the duty sergeant was, Palmer felt that he could not "have reported to a duty supervisor anything that [he was] concerned with that evening" (id. at 22).  Trooper Kmon also testified that he did not know who would be in charge when Sergeant Konieczny was off duty, and that there was "[no]body supervising the town constables that evening."  (Kmon Dep., Pl. Ex. N, at 16-17.)  Nieliwocki, on the other hand, testified that he believed that "[i]f a town trooper was not working and Sergeant Konieczny was not working, . . . then we would report to the trooper that was assigned out of the barracks for that patrol area."  (Nieliwocki Dep., Pl. Ex. A, at 51.)

the proffered "affirmative causal links" between defendant's
inaction following the sexual harassment complained of by the
ambulance volunteers (which itself is not claimed to rise to the
level of constitutional violation) and plaintiff's subsequent
injury six months later were the testimony of expert witness Ryan
and the A&O Manual policy, which — had Konieczny made Nieliwocki
aware of the policy — would have counseled Nieliwocki to take
plaintiff home as she requested instead of to a motel.[14]
However, the circumstances of the ambulance volunteers'
harassment were significantly different from plaintiff's on
February 9, 2002, particularly since the female ambulance
volunteers were not disabled or impaired in any way that caused
Nieliwocki to act unacceptably towards them and there had been no
other analogous incidents from which any pattern could be
inferred, despite Nieliwocki's nearly fifteen years of employment
as a constable and involvement in multiple incidents with

───────────────

[14] A question arose during oral argument as to whether the
constables and state troopers had received and were familiar with
the A&O Manual.  Nieliwocki stated at his deposition that,
although "[w]e have to be familiar with it" (Nieliwocki Dep., Pl.
Ex. A, at 72) he wasn't "familiar with the protocol of the A&O
manual . . . because at MPTC training, some of us were employed
by towns that worked under resident troopers and some of the
people would be employed by towns that had their own police
departments and had, you know, an A&O manual that was not from
the state" (id. at 73).  Defendant claimed familiarity with the
provisions of the A&O Manual.  (See Konieczny Dep., Pl. Ex. J, at
6-10.)

intoxicated persons.

The violent or aggressive propensity opined to by Ryan was described in generalized terms of power and control, which could serve as an alert about Nieliwocki's suitability as a law enforcement officer.  He, however, acknowledged that it would be speculation what discipline would be imposed on Nieliwocki if the investigations and reporting had been properly conducted (see Ryan Dep., Pl. Ex. F, at 54-55) and was speculation to consider what Nieliwocki's response would have been to any discipline short of termination (id. at 78).  There is no evidence of a propensity directed to the plaintiff — with whom he had had no prior contact — nor is there evidence claimed to be predictive of Nieliwocki's unconstitutional behavior particularly with women in compromised circumstances.  Ryan's generalized causation opinion that defendant "had a supervisory obligation at the outset that had a nexus to what ultimately occurred in this case" (id. at 77) lacks the substance or specificity to satisfy this affirmative proximate causation evidentiary requirement.  Thus, because there is insufficient evidence beyond speculation indicating an affirmative causal link between defendant's failures to supervise and report and Nieliwocki's conduct toward plaintiff, the Court grants summary judgment on Counts Three and Four.

39

### 2. Objective reasonableness of defendant's belief

As the Court has concluded that plaintiff's proffered evidence is inadequate to create a triable issue of fact as to the existence of defendant's supervisory liability for any clearly established constitutional violation, it is unnecessary to determine if "it was objectively reasonable for [defendant] to believe, even if mistakenly, that [his] conduct did not violate [plaintiff's] rights," Ricciuti v. N.Y. City Transit Auth., 124 F.3d 123, 127 (2d Cir. 1997) (citing Anderson, 483 U.S. at 641).

## IV. Conclusion

Accordingly, defendant Konieczny's Motion for Summary Judgment [Doc. #101] is DENIED on statute of limitations grounds; and GRANTED on qualified immunity grounds.

IT IS SO ORDERED.

/s/

_____

JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 3rd day of January, 2007.**